IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBBIE D. BISPO,                                        CV.05-1223-PK

                              Plaintiff,                FINDINGS AND
v.                                                      RECOMMENDATION

GSW INC.; AMERICAN WATER
HEATER COMPANY et al.,

                              Defendants.

——

PAPAK, Magistrate Judge:

     Plaintiff Robbie Bispo filed this lawsuit against defendant Robertshaw Controls

Company, among others, alleging strict liability and negligence claims against Robertshaw

arising out of that entity's role as the manufacturer of a water heater gas safety control valve.

Robertshaw's amended motion for summary judgment is now before the court.  For the reasons

set forth below, Robertshaw's amended motion for summary judgment should be granted.

## STATEMENT OF FACTS

**I.**    **The Accident**

     In July 2003, when Bispo attempted to ignite the pilot light of a liquid propane,

Page 1 - FINDINGS AND RECOMMENDATION

residential water heater, the gas exploded, a fire erupted, and Bispo suffered severe burns. (Merrick Dec., CR #177, at 32.)  The explosion occurred at Bispo's home in California.  Before Bispo moved in, his brother operated a restaurant on the premises.  When his brother was not able to make payments to Bispo on the property, Bispo decided to live there until he could sell it. *Id*. at 35.

Bispo acquired the water heater from his brother and installed it in an enclosed, dirt basement area.  (Pickett Dec., CR #184, Ex. 5 at 1.)  The water heater's exhaust pipe was blocked by a rat's nest.  (Merrick Dec. at 135, 147.)  An expert hired by Bispo, Timothy Dunn, indicated that the lack of an effective vent meant that the water heater was not properly installed. *Id.* at 49.  In addition, California code requirements prohibit water heater installation in a dug out cellar because of the potential for propane to accumulate near the ground.  *Id.* at 111.  Bispo fueled the heater from a seven-pound, portable propane tank given to him by his son.  *Id.* at 35-36, 43.  Before the accident, Bispo had filled the portable propane tank at least three times and restarted the water heater without incident.  *Id.* at 33.

The parties dispute whether Bispo smelled gas when he attempted to light the pilot on the day of the accident.  Bispo denied that he smelled gas.  *Id.* at 128.  Immediately after the explosion, Bispo went to a nearby bar to get help.  *Id.* at 117.  He told the bar owner he had left the gas on while he went upstairs to get matches and a flashlight.  *Id.*  He told medical personnel who interviewed him after the explosion that he went back down to the basement with a lit piece of newspaper and that he held his breath just before the explosion because he realized he had left the gas on.  (Merrick Dec. at 123).  Firefighters and the fire investigator at the scene indicated that they could smell propane, *id.* at 128, 139, 148, but Robert Stubbs, an expert for Bispo,

testified that the propane would have been consumed in the explosion, so they might have smelled other odors associated with the fire. (Pickett Dec., Ex. 4 at 128.)  An expert on the perception of odor testified that, because propane vapors are heavier than air, it is possible that, in a poorly stirred environment, a person could not smell the odor because the propane remained near the floor. (Merrick Dec. at 105; Pickett Dec., Ex. 7 at 2.)  The basement installation exacerbates that situation, because a basement has restricted airflow and, here, the basement's dirt floor could have absorbed part of the odor.  (Pickett Dec., Ex. 4 at 87-88, Ex. 5; Ex. 7 at 3.)

The parties also dispute whether Bispo connected a functioning regulator to the propane gas tank that fueled the water heater.  A regulator serves to reduce the pressure of the gas in a propane tank, typically from over 100 pounds per square inch (PSI) to approximately 0.4 PSI. (Pickett Dec., Ex. 3 at 3.)  Bispo testified that he got a regulator from his father and connected the propane tank to it. (Pickett Dec., Ex. 1 at 106, 116, 167-68.)  Bispo's father stated he did not recall giving his son a regulator. (Merrick Dec. at 151).  No regulator was recovered from the scene following the accident.  *Id.* at 52.

## II.    The Gas Safety Control Valve

Defendant Robertshaw designed and constructed the gas safety control valve component that American Water Heater Company used in its manufacture of the water heater.  American Water Heater provided the specifications for the valve, which is a standard part used in gas appliances.  The safety control valve shuts off the flow of gas when the pilot light is out.  The valve includes a plunger with a rubber seal at the end that remains in a downward position when the flame is out.  A user must push a red reset button to allow gas to flow to light the pilot.  The pilot flame creates an electric current that operates a magnetic switch that holds the valve open

and keeps gas flowing so long as the pilot remains lit.  American Water Heater conducts an

operational test of the gas valve on every water heater it produces to make sure it will operate as

intended.  (Merrick Dec. at 87.)

**III.     The Water Heater Warnings**

Bispo understood that propane was explosive and that if he smelled the odor of propane

he should not light a match.  (Merrick Dec. at 36.)  He also understood the lighting instructions

listed on the outside of the water heater, which indicated that before lighting, the user should

turn the gas control knob to "off" and wait for ten minutes to clear any gas that may have

accumulated.  *Id.* at 6, 39.  Bispo testified that he followed those instructions.  *Id.* at 41.  The

instructions also state that the user should smell for gas before lighting.  *Id.*  They further

indicate that the user should turn the manual control valve to "pilot" when attempting to light the

pilot.  *Id.* at 8.  The warning accompanying those instructions states the user should smell the

area next to the floor because some gas is heavier than air.  *Id.* at 6.

The hot water heater also bore a warning that the user should not depend on the presence

of odor to detect leaking gas because odor may fade over time.  *Id.* at 6, 40.  The warning states

that, if the user suspects a leak, the user should check for leaks by using a chloride-free soap and

water solution "or other approved method."  *Id.* at 6.  Bispo indicated that the warning was not

confusing, but he did not suspect a leak nor did he check for a leak when he inspected the water

heater on the day of the accident.  *Id.* at 41.

Robertshaw does not develop the warning labels for the water heater.  *Id.* at 88.

Robertshaw does, however, mark the gas safety valves as having a maximum inlet pressure of

0.5 PSI.  *Id.* at 91.  The appliance manufacturer, American Water Heater Company, created the

warnings that accompanied the water heater itself.  (Pickett Dec., Ex. 1 at 143.)

## IV.    Expert Testimony Regarding the Cause of the Explosion

The experts for both parties agree that a combination of high gas pressure and the application of force to the reset button caused the rubber seal on the gas valve plunger to come loose and block closure of the safety valve.  Dunn, Bispo's expert, testified that this was the likely cause of the seal failure, but his report attributed the valve failure to high pressure alone. *Id.* at 53, 56, 83.  A Robertshaw engineer, Joseph Erdelsky, indicated that the combination of high pressure and "excessive force" on the reset button could strip the rubber off.  (Merrick Dec. at 95; Erdelsky Dec., CR #192, at 4).

The experts do not know when or how the event that led to the gas safety valve damage took place.  Erdelsky testified that, while he was employed as an engineer for Robertshaw, he ran some "outlandish" tests on a different valve model that caused the valve's rubber seal to come off, but when they ran the tests again, the rubber did not come off.  (Merrick Dec. at 95; Erdelsky Dec. at 3; Pickett Dec., Ex. 10 at 65.)  Robertshaw discarded those tests when they relocated their engineering department  from Pennsylvania to Illinois before the events that gave rise to Bispo's suit.  (Erdelsky Dec. at 3; Merrick Dec. at 95; Pickett Dec., Ex. 10 at 65-66.)  Dunn estimated that approximately 5 or 10 PSI at the least would cause the rubber seat to come loose, but admitted he did not know for certain how much pressure it would take and his tests were unable to replicate the rubber seat failure at 88 PSI. (Merrick Dec. at 51.)  He found "no magic number" that would indicate each time that the rubber seat would come loose, and said he considered what happened a "unique event" because he had never run across a similar failure in the hundreds of valves he has tested.  *Id.* at 62-63.  Both experts indicated that many variables

could play a part in the rubber seal failure, including "dwell time under high pressure, the temperature of the control, the speed with which the button is depressed," (Erdelsky Dec. at 10) and the amount of force applied to the reset button.  (Merrick Dec. at 61.)

The parties do, however, agree that a person who attempted to push the reset button in a high pressure situation would receive some indication that something was wrong with the water heater.  Dunn indicated that if a person pushed the reset button when the gas pressure was high, the release of gas would make a sound like a teapot going off.  *Id.* at 54, 64.  An American Water Heater employee  indicated that a person who tried to depress the pilot light button would be able to feel over-pressurization of 100 PSI because it would be difficult to get the button to go down.  *Id.* at 88.

Despite the experts' concurrence that the way the rubber seal dislodged involved a unique combination of variables, they offered different opinions regarding the foreseeability of the accident.  Dunn testified that he expected Robertshaw to foresee a dislocation of the rubber seal and to prevent a valve failure that renders the appliance unsafe when the pilot goes out.  (Pickett Dec., Ex. 1 at 111, 137.)  Dunn also testified that White Rodgers built their water heater combination valve to withstand pressure of 100 PSI.  *Id.* at 82.  Both Erdelsky and Dunn, however indicated that the White Rodgers design for the magnetic gas safety valve is the same as the Robertshaw design.  (Merrick Dec. at 68-69, Erdelsky Dec. at 11.)

Once the high pressure event damaged the gas safety valve, unburned gas could escape when the pilot light was out.  The gas would escape, however, only if the heater's manual control valve was in the "on" position and the thermostat demanded heat.  (Pickett Dec., Ex. 2 at 110; Ex. 11 at 56.)  Until that combination of variables took place, the water heater would work normally.  (Pickett Dec., Ex. 3 at 5; Erdelsky Dec. at 11.)  Bispo's expert estimated that gas

Page 6 - FINDINGS AND RECOMMENDATION

leaked for 1 to 4 hours before Bispo attempted to light the pilot.  (Pickett Dec., Ex. 5.)

**V.     State Contacts With the Case**

This case has contacts with several states.  Bispo resided in California at the time of the accident but currently resides in Oregon.  His brother purchased the water heater in Oregon.  Robertshaw Controls Company is a Delaware corporation with its principal place of business in Virginia.  In addition, some of Robertshaw's design and testing activities took place in Pennsylvania before Robertshaw moved its engineering department to Illinois.  At oral argument, Robertshaw indicated that the valve parts were assembled in Mexico and then shipped to California.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues exist for trial.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence.  *See, e.g., Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (20000; *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990).

## DISCUSSION

Bispo asserts strict liability and negligence claims against Robertshaw.  The strict liability claim is premised on manufacturing defect, design defect and inadequate warning

Page 7 - FINDINGS AND RECOMMENDATION

theories.  The negligence claim asserts that Robertshaw failed to take steps to acquire

information about the dangers of liquid propane gas so it could provide that information to

consumers and that Robertshaw "failed to have an adequate safety program in place" to protect

liquid propane gas consumers.  Bispo abandoned the manufacturing defect claim at oral

argument.  The court addresses the remaining claims below.

## I.      Choice of Law

In personal injury suits, possible sources for the governing law include the state where

the injury occurred and the state where the conduct that led to the injury occurred.  *See, e.g.,*

*Western Helicopter Servs. Inc v. Rogerson Aircraft Corp.*, 728 F. Supp. 1506, 1512 (D. Or.

1990); *Dabbs v. Silver Eagle Mfg. Co.*, 98 Or. App. 581, 583, 779 P.2d 1104 (1989);

Restatement (Second) of Conflict of Law § 145, cmt. c (1971).  Here, the accident occurred in

California.  Plaintiff lived in California at the time of the accident but now resides in Oregon.

Rogershaw maintains its principal places of business in Virginia and the valves were shipped to

California.  The parties focus on California or Oregon as possible sources for governing law.

"A federal court sitting in diversity must apply the forum state's choice of law rules to

determine the controlling substantive law."  *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002).

Oregon's choice of law analysis first requires that the court determine whether a material

difference exists between Oregon substantive law and the law of other possible fora.  *See, e.g.,*

*Portland Trailer & Equip. Inc. v. A-1 Freeman Moving & Storage, Inc.*, 182 Or. App. 347, 352,

49 P.3d 803 (2002)  A false conflict arises in two situations: "(1) when the laws of the two states

are the same or would produce the same result, and (2) when no substantial conflict exists

between the states' policies or interest in the particular factual context in which the question

arises."  *Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 611-12 (9th Cir. 1975) (citing *Erwin v.*

Page 8 - FINDINGS AND RECOMMENDATION

*Thomas*, 264 Or. 454, 506 P.2d 494 (1973).

Under Oregon conflicts of law principles, a court applies the law of the state "whose policies and interests are vitally involved." *Erwin*, 264 Or. at 458. If the case does not implicate any state's interest, the law of the forum should apply. *Id.* If two or more states have substantial interests, Oregon courts apply the "most significant relationship" approach of the Restatement (Second) Conflicts of Law to determine the law that governs. *Id.* at 457; *Forsyth*, 520 F.2d at 612.

**A.      Conflicts in Law That Could Affect the Outcome**

California law differs from the law in Oregon regarding the burden of proof in design defect products liability cases. Under California's standard, once the plaintiff demonstrates that the product's design caused his injury, the burden shifts to the manufacturer to establish the benefits of the challenged design outweigh its inherent risk of danger to the consumer. *See Barker v. Lull Engineering Co.*, 20 Cal. 3d 413, 433, 573 P.2d 443 (1978). The Oregon Supreme Court explicitly rejected the *Barker* opinion. *See Wilson v. Piper Aircraft Corp.*, 282 Or. 411, 413, 579 P.2d 1287 (1979). Rather, in Oregon, the plaintiff bears the burden to prove that the product was both defective and unreasonably dangerous. *See McCathern v. Toyota Motor Corp.*, 332 Or. 59, 77, 23 P.3d 320 (2001).

**B.      States' Relative Interests**

When the substantive laws of the potential fora materially differ, the court must consider the states' relative interests in the litigation. *See Erwin*, 264 Or. at 458. California shifted the burden of proof to the defendant to lighten the plaintiff's evidentiary burden, as is consistent with the policies behind the strict liability doctrine. *See Barker*, 20 Cal. 3d at 433. In addition, the *Barker* court reasoned that "the feasibility and cost of alternative designs . . . involve technical

Page 9 - FINDINGS AND RECOMMENDATION

matters peculiarly within the knowledge of the manufacturer." *Id.* at 431. Thus, California has

an interest in protecting its residents from harmful products by alleviating their burden of proof

in design defect cases.

By contrast with California's approach, the rule in Oregon favors manufacturers. The

Robertshaw Defendants, however, are not residents of Oregon. Therefore, Oregon has little

interest in whether California law requires that they bear the burden to prove that the benefits of

the challenged design outweigh its inherent risk of danger to the consumer. *See Erwin*, 264 Or.

at 459 (where defendants were not state residents, state had little interest in the application of its

law that favored defendants); *Dabbs*, 98 Or. App. at 585 (where defendants were not state

residents, state had little interest in application of its statute of limitations).

Moreover, Bispo's current residence in Oregon does not require that Oregon law apply.

While Oregon has an interest in providing redress when its residents suffer wrongs, *see Portland

Trailer & Equipment Corp.*, 182 Or. App. at 359-60, that policy "cannot be offended" if the court

of another state affords protection to an Oregon resident that Oregon itself does not afford.

*Erwin*, 264 Or. at 459; *see also Dabbs*, 98 Or. App. at 585. Thus, California has the greater

interest in this case. The fact that the valves were shipped to California and the accident took

place there bolsters the Court's conclusion. *See Superior Leasing v. Kaman Aerospace Corp.*,

No 04-3099, 2006 U.S. Dist. LEXIS 92426, at *31 (D. Or. Dec. 19, 2006).

## II.    Design Defect

California law allows a plaintiff to prove a design defect in two ways. First, under the

consumer expectations test, a plaintiff can prove defective design "if the plaintiff establishes that

the product failed to perform as safely as an ordinary consumer would expect when used in an

intended or reasonably foreseeable manner." *Barker*, 20 Cal. 3d at 432. Second, under the risk-

Page 10 - FINDINGS AND RECOMMENDATION

benefit test, a product may have a defective design if the plaintiff demonstrates that the design proximately caused the injury and the defendant fails to establish the benefits of the challenged design outweigh its inherent risk of danger. *Id.* The tests are not mutually exclusive; a plaintiff may proceed under either or both. *See id.* at 435; *see also Campbell v. General Motors Corp.* 32 Cal. 3d 112, 126, 649 P.2d 224 (1982).

### A.    Consumer Expectations Test

Courts assess whether the consumer expectations test applies by asking if "ordinary users or consumers of a product may have reasonable, widely accepted minimum expectations about the circumstances under which it should perform safely." *Soule v. General Motors Corp.*, 8 Cal. 4th 548, 566, 882 P.2d 298 (1994). The test does not apply if the plaintiff's theory of design defect involves "complicated design considerations," "obscure components," or "esoteric circumstances." *Id.* at 563, 569-70; *see also Sparks v. Owens-Illinois*, 32 Cal. App. 4th 461, 474, 38 Cal. Rptr. 2d 739 (1995). When, however, material issues of fact remain regarding the circumstances of an accident, the court cannot decide at summary judgment whether the consumer expectations test should apply. *See McCabe v. American Honda Motor Co.*, 100 Cal. App. 4th 1111, 1124, 123 Cal. Rptr. 2d 303 (2002).

In *Soule*, the California Supreme Court explained that "in some cases . . . ordinary knowledge as to the product's characteristics may permit an inference that the product did not perform as safely as it should." *Soule*, 8 Cal. 4th at 567 (citations omitted). For example, consumers expect that their automobiles will not "explode while idling at stoplights, experience sudden steering or brake failure as they leave the dealership, or roll over and catch fire in a two-

Page 11 - FINDINGS AND RECOMMENDATION

mile-per-hour collision." *Id.* at 567 n.3.[1]  Similarly, in *McCabe*, the court explained that "an air

bag that inflates for no apparent reason while one is cruising down the road at 65 miles per hour

is the kind of product failure about which consumers may form minimum safety expectations . . .

while an air bag that deploys in a low-speed frontal collision may not be."  100 Cal. App. 4th at

1124 *citing Pruitt v. GM Corp.*, 72 Cal. App. 4th 1480, 1484, 86 Cal. Rptr. 2d 4 (1999).

        In *Soule*, however, the court held that the consumer expectations test did not apply

because the "[p]laintiff's theory of design defect was one of technical and mechanical detail."

*Soule*, 8 Cal. 4th at 570.  The plaintiff posited design defects in the placement of a car's wheel

control arm bracket and in the configuration of the car's internal frame.  *Id.* at 557.  The court

concluded "an ordinary consumer of automobiles cannot reasonably expect the car's frame,

suspension, or interior will be designed to remain intact in any and all accidents."  *Id.* at 570;  *see

also Morson v. Sup. Ct.*, 90 Cal. App. 4th 775, 793-795, 109 Cal. Rptr. 2d 343 (2001) (presence

and effect of allergenic proteins in latex rubber gloves "beyond common experience" of ordinary

consumers).

        As a preliminary matter, I find that the parties have presented sufficient evidence

regarding the cause of the gas safety valve failure for the court to reach the question of whether

the consumer benefits test applies.  Both sides agree that the valve failed as a result of external

force applied to the reset button in combination with high pressure in the gas line.  The question,

therefore, is whether ordinary consumers would expect the water heater to perform safely in

those circumstances.

        I find that the consumer benefits test does not apply.  At oral argument, Robertshaw

---

[1] Commentators have noted that these fact scenarios suggest a *res ipsa loquitur*-type
analysis. *McCabe*, 100 Cal. App. 4th at 1121 n.4 (citing Henderson & Twerski, *Achieving
Consensus on Defective Product Design*, 83 Cornell L. Rev. 867, 899-900 (1998)).

asserted that ordinary consumers do not have expectations regarding the circumstances in which a rubber seal on a water heater gas safety valve would fail.  Bispo countered that consumers *do* expect that their water heaters will not leak gas when the pilot light goes out.  While I concur that consumers do not expect gas to leak from their appliances, "a consumer expectation analysis cannot be determined by looking at the product in isolation, but rather must be considered in the context of the facts surrounding its failure."  *McCabe*, 100 Cal. App. 4th at 1122.  I find that ordinary consumers do not have expectations regarding how or when a rubber seal on a water heater gas safety valve might fail.

Moreover, the consumer expectations test requires that the plaintiff demonstrate that he or she used the product "in an intended or reasonably foreseeable manner."  *Barker*, 20 Cal. 3d at 432.  Assuming *arguendo* that Bispo did not cause the gas valve failure, I nevertheless question whether Robertshaw could reasonably foresee that, in combination with high pressure in the gas line, any person would exert sufficient force on the reset button to dislodge the rubber seal. Tests conducted by experts for both parties could not reproduce a seal failure under similar circumstances.  In addition, the experts agreed that many variables could play a part in the rubber seal failure, including the force applied to the button and the speed it was depressed.  Thus, I conclude that Robertshaw could not foresee that a user might dislodge the rubber seal by applying force to the reset button when the gas line was subject to high pressure.  Therefore, even if the court found that ordinary consumers had expectations about the operation of a water heater gas safety valve, the consumer expectation test would not apply because Robertshaw could not have foreseen the use that led the valve to dislodge.

**B.    Risk-Benefit Test**

Under the risk-benefit test for design defect, the plaintiff bears the initial burden to prove

that the product's design proximately caused the injury. *See Barker*, 20 Cal. 3d at 432;

*Campbell*, 32 Cal. 3d at 119. Proximate cause requires that the alleged wrong was "a substantial

factor in producing the injury." *Soule*, 8 Cal. 4th at 572. The plaintiff need not "disprove every

possible alternative explanation of the injury." *Campbell*, 32 Cal. 3d at 121. Rather, the plaintiff

need only show that causation may "logically and reasonably be inferred from the circumstantial

evidence. The mere fact that other inferences adverse to the plaintiff may be drawn does not

render the inference favorable to the plaintiff too conjectural or speculative for consideration by

the jury." *Id.* (internal citations omitted). Where, however, plaintiff would have suffered

identical injuries notwithstanding the claimed defect, the defect is not the legal cause of the

injury. *See Soule*, 8 Cal. 4th at 572; *see also Johnson v. American Standard, Inc.*, 43 Cal. 4th 56,

65, 179 P.3d 905 (2008) (failure to warn not the legal cause where court presumes sophisticated

users know the product's dangers); *Visueta v. General Motors Corp*. 234 Cal. App. 3d 1609,

1617, 286 Cal. Rptr. 402 (1991) (design of parking brake location not the legal cause because

parking brake was inoperable at the time of the accident due to improper maintenance).

       Bispo has met his burden to prove causation. Both parties agree the gas safety valve

failed and gas leaked from the water heater as a result. Neither party suggests that the ensuing

explosion would have occurred even if the gas safety valve had not failed. Thus, the valve

failure was a substantial factor contributing to Bispo's injuries.

        Once the Plaintiff proves causation, the burden shifts to the defendant to prove that the

risks posed by the product do not outweigh the benefits of its design. *See Barker*, 20 Cal. 3d at

432. This balancing test involves several factors, including "the gravity of the danger posed by

the challenged design, the likelihood the danger would occur, the feasibility of a safer alternative

design, the financial cost of an improved design and the adverse consequences to the product and

Page 14 - FINDINGS AND RECOMMENDATION

the consumer that would result from an alternative design."  *Id.* at 431.

The court concludes that Robertshaw met its burden on the risk-benefit test.  Although a propane explosion caused by leaking gas poses a severe danger, the likelihood that an explosion would occur is remote under the circumstances posited here.  The parties agreed that the gas safety valve failure was a "unique" product of several variables.  Robertshaw's engineers were not able to replicate the gas valve failure they produced after conducting "outlandish" tests on another valve model in the 1980s.  More importantly, experts for both sides were unable to replicate the gas valve failure that led to the accident in this case.  The experts could also not predict the circumstances–the amount of pressure in the line and the type of force applied to the reset button--that might lead to a failure.  Moreover, the experts agreed that the suggested alternative, White Rodgers' gas safety valve design, does not materially differ from the Robertshaw design.  I conclude from these undisputed facts that Robertshaw has met its burden under the risk-benefit test because the evidence indicates that the gas safety valve posed almost no risk and that no alternative design is readily available.

Bispo contends that the installation of a gas detector could have prevented the explosion.  However, a component manufacturer may be held strictly liable only for damages caused by a component part that was defective at the time it left the component part manufacturer's factory.  *See Jimenez v. Superior Court*, 29 Cal. 4th 473, 480, 58 P.3d 450 (2002) *citing Wiler v. Firestone Tire & Rubber Co.*, 95 Cal. App. 3d 621, 629, 157 Cal. Rptr. 248 (1979).  Here, the evidence is insufficient to show that Robertshaw's gas safety valve had a design defect when it left Robertshaw's factory.  Therefore, Robertshaw cannot be held strictly liable for any failure to provide a gas detector in the finished product.

In conclusion, reading the evidence in the light most favorable to Bispo, Robertshaw

Page 15 - FINDINGS AND RECOMMENDATION

cannot be held strictly liable for a design defect in the gas safety valve under the consumer expectations test or the risk-benefit test.  Accordingly, Robertshaw's motion for summary judgment as to Bispo's design defect claim should be granted.

## III.    Warning Defect

The difference between strict liability and negligence claims for failure to warn lies in the basis for determining whether a manufacture has constructive knowledge of the need to warn. In the strict liability context, a defendant may be liable for failure to warn if the plaintiff proves "that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacturing and distribution." *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 1002, 810 P.2d 549 (1991).  On the other hand, in the negligence context, a plaintiff must prove that a manufacturer did not warn of a particular risk "that a reasonably prudent manufacturer would have known and warned about." *Id.*

Both negligence and strict liability failure to warn claims are susceptible to the sophisticated user defense.  *See Johnson*, 43 Cal. 4th at 65.  Under this defense, courts charge the sophisticated users of a product "with knowing the particular product's dangers." *Id.*  The defense focuses on "whether the danger in question was so generally known within the trade or profession that a manufacturer should not . . . have to provide a warning specific to the group to which plaintiff belonged." *Id.* at 72.  Moreover, California courts are reluctant to impose liability for the component manufacturer's failure to warn the consumer where another manufacturer packaged, labeled and marketed the final product.  *Lee v. Electronic Motor Division*, 169 Cal. App. 3d 375, 388-89, 215 Cal. Rptr. 195 (1985).

Here, no evidence indicates that Robertshaw had constructive knowledge that high

Page 16 - FINDINGS AND RECOMMENDATION

pressure in the gas line combined with force applied to the reset button could cause gas safety valves to fail.  Nothing indicates that the prevailing scientific knowledge showed that gas safety valves could fail in those circumstances.  In fact, the parties' experts could not replicate the failure.  In addition, although Robertshaw's own tests in the 1980s on a different valve model suggested a valve could fail under similar conditions, Robertshaw was unable to reproduce the problem, much less predict when and how it could occur.

Moreover, Robertshaw did not have a specific, additional duty to warn consumers about the potential that gas could leak from the water heater.  The water heater manufacturer provided instructions that accounted for the possibility of a gas leak.  Even if Robertshaw had constructive knowledge of a potential gas valve failure, Robertshaw had no need to warn the end user because the valve packaging indicated its pressure limits and the manufacturer knew and warned of the potential risks of gas leaks.  Therefore, Robertshaw's motion for summary judgment on Bispo's strict liability and negligence failure to warn claims should be granted.[2]

## CONCLUSION

For the foregoing reasons, defendant Robertshaw's Amended Motion for Summary Judgment (#178) should be granted.  Defendant Robertshaw's Motion to Exclude Testimony of

---

[2] I do not reach Robertshaw's argument regarding the misuse affirmative defense.  I note, however, that under California's comparative fault doctrine, a manufacturer cannot avoid strict liability for a defective product "even when the plaintiff's own conduct has contributed to the injury."  *Daly v. General Motors Corp*, 20 Cal. 3d 725, 738, 575 P.2d 1162 (1978).  Thus, the misuse defense requires that the defendant establish "an unforeseeable abuse or alteration of the product after it left the manufacturer's hands was the sole reason that the product caused an injury."  *Campbell v. Southern Pacific Co.*, 22 Cal. 3d 51, 56-57, 583 P.2d 121 (1978).  I question whether Robertshaw could meet this burden in light of the fact that neither party knows the precise circumstances that would dislodge the rubber seal when a user pushed the reset button during a high pressure event.  The court, however, need not decide the issue because summary judgment on the merits is appropriate in Robertshaw's favor on the grounds discussed above.

Experts Dunn, Stubbs & Romig (#186) should be denied as moot.

**SCHEDULING ORDER**

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due September 11, 2008.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections

/ / /

/ / /

/ / /

/ / /

/ / /

are filed and the review of the Findings and Recommendation will go under advisement on that

date.

Dated this 27th day of August, 2008.


  /s/  Paul Papak
Honorable Paul Papak
United States Magistrate Judge